## A00A0040. SEWELL v. THE STATE.
### (536 SE2d 173)

MILLER, Judge.

Thomas Edward Sewell was tried before a jury and found guilty of aggravated sodomy (Count 1), sexual battery as a lesser included offense to aggravated sodomy (Count 2), child molestation (Counts 3 through 7), and attempted child molestation (Count 8) for sexual acts directed at M. L. and C. W. On appeal, his six enumerations of error (1) challenge the sufficiency of the evidence and complain of (2) improper bolstering; (3) the admission of similar or extrinsic acts; (4) restrictions on cross-examination; (5) the trial court's refusal to per-

---

[10] See OCGA § 42-8-60 (a).
[11] 208 Ga. App. 472 (431 SE2d 136) (1993).

mit defense counsel to review documents with which an expert witness refreshed his recollection; and (6) the admission of evidence as to how a police investigator determines whether a child is truthful. Except for the attempted child molestation alleged in Count 8, we affirm.

Viewed in the light most favorable to the jury's verdicts, the evidence revealed the following: Over the weekend of July 5, 1996, the then 14-year-old victim, M. L., was to spend the night at the home of his second cousin, defendant Sewell, and his wife. After watching television that evening, M. L. went to sleep wearing a pair of boxer shorts Sewell gave him. He later awoke to find Sewell kneeling beside the bed and felt "something go down [his] pants." M. L. was scared and tried to push Sewell away with his hands. Sewell started kissing M. L. all over and trying to take the boy's clothes off. Sewell then committed an act of oral sodomy on M. L. Sewell got on top of M. L. and pinned his hands and legs down. Using his hands, Sewell masturbated both M. L. and himself to the point of climax. Sewell also tried to commit an act of anal sodomy, where M. L. felt something wet going in the back of him. After 15 or 20 minutes, M. L. curled up against the wall and went to sleep.

The next morning when M. L. awoke, Sewell was still with him in bed, and defendant started kissing M. L. and putting his hands down M. L.'s pants, touching M. L.'s genitals and touching himself. After M. L. got dressed, Sewell accosted him in the kitchen, pushed M. L. up against the wall, and told him he better not tell anyone. Although there were telephones in the Sewell residence, M. L. felt defendant was always near so M. L. could not call anyone.

Saturday, Sewell showed M. L. the church where defendant was the preacher. There, M. L. met C. W., a boy who sang in the choir. It was arranged that C. W. would spend the night with M. L. at Sewell's. The boys shared the same room M. L. slept in the night before. M. L. again awoke in the middle of the night with Sewell kneeling beside the boy's bed, trying to kiss M. L. and rubbing him all over. M. L. resisted, and Sewell left after M. L. said he would wake up C. W. M. L. went back to sleep, but Sewell again awakened M. L., kissing M. L. on the lips and chest. Sewell started removing the boy's pants and committed an act of oral sodomy and masturbated the boy. M. L. ran downstairs and saw C. W. asleep on the sofa. M. L. told Sewell that he would wake C. W. if Sewell did not leave M. L. alone. M. L. eventually returned to the upstairs bedroom, and Sewell did not bother him further. Sunday night, after M. L. was home, he told his mother what Sewell had done to him.

In a taped interview, C. W. confirmed that Sewell had sent C. W. back downstairs to sleep on the couch. There, Sewell had touched C. W.'s private parts inside C. W.'s clothes. C. W. kicked at Sewell who

left and went back upstairs and "was messing with [M. L.]" After 30 minutes, M. L. came downstairs yelling at Sewell to leave him alone, stop touching him, or he would tell his mother when he got home. Sewell picked up M. L. and took him back upstairs.

Defendant's first cousin, John Franklin Sewell, related earlier incidents when defendant fondled and kissed defendant's then ten-year-old cousin and further described two attempts by defendant to commit anal sodomy on him. One such attempt was witnessed by Timothy Eugene Sewell.

1. The first enumeration urges the general grounds. Sewell argues the evidence is insufficient because M. L. was not a credible witness and because M. L.'s testimony conflicts with Sewell's own.

(a) On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the verdict, and the appellant (defendant here) no longer enjoys the presumption of innocence.[1] An appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia.*[2] Any conflict in the testimony of the witnesses, including the State's witnesses, is a matter of credibility for the jury to resolve. So long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.[3]

(b) A person commits child molestation when he "does any immoral or indecent act to or in the presence of or with any child under the age of 16 years,"[4] with the intent to arouse or satisfy the sexual desires of either the child or the person. A person commits aggravated child molestation by any act of child molestation "which act physically injures the child or involves an act of sodomy."[5] And a person commits the offense of criminal attempt when, "with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime."[6]

(c) "The testimony of a single witness is generally sufficient to establish a fact."[7] Specifically, "[t]here is no requirement that the testimony of the victim of child molestation or aggravated child molestation be corroborated."[8] Nevertheless, in this case the testimony of M.

---

[1] *Watts v. State*, 186 Ga. App. 358 (1) (366 SE2d 849) (1988) (whole court).

[2] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] *Howard v. State*, 261 Ga. 251, 252 (403 SE2d 204) (1991); *Turner v. State*, 223 Ga. App. 448, 449 (1) (a) (477 SE2d 847) (1996).

[4] OCGA § 16-6-4 (a).

[5] OCGA § 16-6-4 (c).

[6] OCGA § 16-4-1.

[7] OCGA § 24-4-8.

[8] (Citations omitted.) *Dent v. State*, 220 Ga. App. 147 (1) (469 SE2d 311) (1996). Accord *Adams v. State*, 186 Ga. App. 599 (1) (367 SE2d 871) (1988) (whole court).

L. is corroborated by his outcry to his mother[9] and by the witness C. W.[10] And the circumstances related by M. L. corroborate the testimony of Sewell's indecent liberties with C. W. The evidence is sufficient to authorize the jury's verdicts that Sewell committed aggravated child molestation as alleged in Count 1[11] and sexual battery as a lesser included offense to the aggravated child molestation alleged in Count 2.[12] The evidence is also sufficient to authorize the jury's verdicts that Sewell is guilty, beyond a reasonable doubt, of the acts of child molestation alleged in Counts 2, 4, 5, 6, and 7.[13] But as to the criminal attempt alleged in Count 8,[14] in our view the evidence shows the completed offense of the intended molestation and not any subsequent attempt, because Sewell had already committed the Saturday night molestations when M. L. fled and found C. W. downstairs. While a person can be convicted of criminal attempt upon proof of the completed offense, he "may not be convicted of both the criminal attempt and the completed crime."[15] Consequently, we reverse the judgment of conviction as to Count 8 because that criminal attempt to commit child molestation is subsumed into the separate consummated crime for which Sewell was also convicted.

2. A licensed psychologist evaluated M. L. and performed a battery of tests upon him. During direct examination by the State, this witness was asked, "Tell me how [M. L.] performed on those tests." In response, the witness stated: "Based upon the model that I used, . . . I concluded that he had been sexually abused." The trial court denied Sewell's ensuing motion for mistrial based upon impermissible expert opinion testimony as to the ultimate issue for the jury, but gave cautionary instructions for the jury to "disregard that portion of [the] testimony." In this case, "the exclusion of the testimony and the trial court's curative instructions prevented [any] error from occurring."[16]

3. The admission of defendant's so-called similar or extrinsic acts of fondling and attempted anal sodomy on other cousins is enumer-

---

[9] *Dent v. State*, supra, 220 Ga. App. at 147 (1); *Stander v. State*, 193 Ga. App. 212 (1) (387 SE2d 422) (1989).

[10] *Turner v. State*, supra, 223 Ga. App. at 449 (1) (b).

[11] *Smith v. State*, 210 Ga. App. 634, 636 (2) (c) (437 SE2d 333) (1993). Accord *Deyton v. State*, 182 Ga. App. 73 (1) (354 SE2d 625) (1987).

[12] See, e.g., *Strickland v. State*, 223 Ga. App. 772, 774 (1) (a) (479 SE2d 125) (1996) (whole court) (sexual battery can be included in child molestation as a matter of fact).

[13] *Turner v. State*, supra, 223 Ga. App. at 449 (1) (b). Accord *Dent v. State*, supra, 220 Ga. App. at 147 (1).

[14] This count charged Sewell with criminal attempt to commit child molestation by making C. W. leave the room where M. L. was sleeping and trying to restrain M. L. so that the accused could perform a sexual act on M. L.

[15] OCGA § 16-4-2.

[16] *Brown v. State*, 262 Ga. 833, 834 (1) (426 SE2d 559) (1993).

ated as error. But proof of his predilection for pederasty is relevant and admissible to show his state of mind toward the type of young victims such as M. L. and C. W. and to establish his pattern of sexual predation.[17] The 20-year lapse of time between episodes of the sexual exploitation of young family members does not render this evidence impermissibly stale.[18]

4. Sewell next contends the trial court impermissibly restricted his cross-examination of the sheriff's deputy who first interviewed M. L.

(a) The defendant is entitled to a thorough and sifting cross-examination of the witnesses called against him,[19] but the scope of cross-examination is not unlimited. Rather, the extent of permissible cross-examination lies within the sound discretion of the trial judge.[20] Restrictions on cross-examination will not be cause for reversal unless that discretion is abused.[21]

When asked, "It's true . . . that you had some problems with some of the officers in other matters in terms of your veracity in terms of testifying," the witness replied, "No, sir." The State objected to improper impeachment, and defense counsel explained that other "officers at the sheriff's department testified under oath that [this witness] could not be believed, that they would not believe her under oath." The trial court ruled that the witness would not be obliged to answer the question unless and until her bad reputation for veracity was introduced "through the mouths of these other witnesses," at which point this witness could be recalled.

On appeal, Sewell argues that he was unfairly denied impeachment under OCGA § 24-9-82[22] because he was (allegedly) prohibited from asking the *factual* question "whether any of her fellow officers had testified she could not be believed under oath." But that is not the question posed at trial. The ambiguous and prolix question put to the witness at trial was whether *she* had any problems with other officers about her veracity. This asks for her opinion. The truth of the circumstance that other officers testified that they would not believe her under oath does not disprove or impeach her opinion that, no, she has no problem with other officers. Consequently, Sewell's contention that he was denied impeachment under OCGA § 24-9-82 is not sup-

---

[17] *Green v. State*, 242 Ga. App. 868 (3) (532 SE2d 111) (2000). Accord *Wellborn v. State*, 258 Ga. 570, 572 (2) (372 SE2d 220) (1988).

[18] *Nichols v. State*, 221 Ga. App. 600, 602 (3) (473 SE2d 491) (1996). Compare *Tyson v. State*, 232 Ga. App. 732 (1) (503 SE2d 640) (1998) (40-year-old episodes of cunnilingus not involving family member too remote).

[19] OCGA § 24-9-64.

[20] *Belins v. State*, 210 Ga. App. 259, 262 (3) (435 SE2d 675) (1993).

[21] *Chastain v. State*, 257 Ga. 54, 55 (354 SE2d 421) (1987).

[22] "A witness may be impeached by disproving the facts testified to by him."

ported by the record.

(b) In order to impeach a witness by proof of general bad character, OCGA § 24-9-84 contemplates the presence of an impeaching witness, to whom will be put the statutory questions.[23] The final statutory question is whether, based on that character, the impeaching witness would believe the other on his oath. The trial court's procedural ruling that proof of the witness's general bad reputation for veracity would have to come from her fellow officers, testifying from the witness stand, was correct. If the effect of that procedural ruling was to bar Sewell from asking the factual question he desired until after the defense produced impeachment witnesses, we hold it nevertheless did not amount to an abusive restriction on the permissible extent of cross-examination, because the order of presentation of evidence also is a matter committed to the sound legal discretion of the presiding judge.[24]

5. Defendant made no timely written demand for discovery before arraignment under either OCGA § 17-16-4 or former OCGA § 17-7-211, and the trial court adhered to an earlier decision not to extend the time for requesting discovery. Nevertheless, the court examined the psychologist's written evaluation of M. L. for exculpatory matter within the purview of *Brady v. Maryland*[25] and found none. During Sewell's cross-examination of the psychologist, the doctor made reference to a "Confidential Questionnaire for Children and Adolescents," which M. L.'s mother had filled out, giving details of her background and M. L.'s background. Apparently reading from this questionnaire, the witness itemized some of those details: During pregnancy, M. L.'s mother was not on any medications; did not drink alcohol or use drugs; and smoked a half-pack of cigarettes per day. M. L. was not premature; it was a normal birth; and M. L.'s birth weight was four pounds, two ounces. When defense counsel requested a copy, claiming he was entitled to it, the State objected. The witness stated he had not prepared his trial testimony with this questionnaire and "[had] not looked at it for the last several months." Upon further cross-examination, the psychologist confirmed that this questionnaire was the only information he received about M. L. from the mother.

On appeal, Sewell contends the trial court erroneously denied him the opportunity to review documents which the witness used to refresh his recollection. "[I]f a witness uses documents to refresh memory *after* the inception of a hearing or trial, then during that hearing or trial, the cross-examiner is entitled to examine such docu-

---

[23] *Dent v. State*, 14 Ga. App. 269 (4) (80 SE 548) (1914).
[24] *Teat v. State*, 237 Ga. App. 867, 870 (2) (d) (516 SE2d 794) (1999).
[25] 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

ments."[26] Pretermitting whether the questionnaire was discoverable or privileged before trial,[27] it is apparent that the witness either read from the document or testified from it after the inception of the trial. Consequently, the trial court erred in failing to permit the cross-examiner to examine the document. But we find the error harmless in this instance.

> The trial judge should have granted the [defendant's request] to examine the [document]; [but] the error is not reversible. Our review of the evidence convinces us that it is highly probable that the error committed as a result of the denial of [access to the document which the witness had already read into the record in substantial part] did not contribute to the verdict and is, therefore, harmless [under the test enunciated in] *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976).[28]

6. When the lead investigator was questioned on direct examination about her qualifications to conduct a child molestation inquiry, she testified without objection that she had attended a special training session on "things to look for [regarding] child abuse cases, child molestation cases." Specifically, she attended a three-day class on interview techniques and referred (without objection) to "signs to look for, whether they're telling the truth or maybe telling a lie." Of the signs she was taught to look for, "[e]motion is one. . . . Eye movement. Just a whole demeanor-type thing you look for." In deciding which cases to pursue further, the investigator testified without objection that she first attempts to determine whether the complainant is telling the truth about an alleged perpetrator, because "it's just as important to find that person innocent as it is to find out if that person is guilty." Finally, when the investigator was asked, "What kind of questions will you ask a child . . . to determine whether they may or may not be telling the truth," Sewell interposed the following objection: "I don't think this witness is competent to do that." Sewell further argued that this kind of testimony is "not permitted from a person who is not licensed. . . ." This objection was overruled, and the witness answered the question as she recalled it, first by describing the setting. She would interview the child away from any influential adult (such as the possible perpetrator), and then engage the

---

[26] (Emphasis in original.) *Johnson v. State*, 259 Ga. 403, 405 (2) (383 SE2d 118) (1989).
[27] See, e.g., *Horne v. State*, 192 Ga. App. 528, 530-531 (4) (a) (385 SE2d 704) (1989) (whole court).
[28] *Johnson v. State*, supra, 259 Ga. at 405 (2). See also *Sterling v. State*, 267 Ga. 209, 211 (3) (477 SE2d 807) (1996).

child in general conversation. She consciously avoids direct questioning at first and avoids putting words in the child's mouth but seeks to have the child voluntarily reveal what (if anything) happened, using general terms such as "good touch" and "bad touch."

On appeal, Sewell essentially ignores the enumerated error and digresses to complain of the investigator's credibility or to discuss cases from other jurisdictions where molestation convictions have been reversed allegedly because of research on the suggestibility of child molestation reporters subjected to suggestive questioning. In this case, nowhere did this witness testify as to her opinion on the truthfulness of M. L. or C. W. or otherwise place her imprimatur on the credibility of either victim.[29] The trial court did not err in this instance by permitting the investigator to relate her interview techniques.

*Judgment affirmed in part and reversed in part. Pope, P. J., and Smith, P. J., concur.*

DECIDED JUNE 13, 2000.

*Leonard Danley*, for appellant.
*David McDade, District Attorney, William J. Atkins, Assistant District Attorney*, for appellee.

---

[29] See *Long v. State*, 241 Ga. App. 370, 372 (3) (526 SE2d 875) (1999). Compare *Dickerson v. State*, 207 Ga. App. 241, 242 (2) (427 SE2d 591) (1993).