## S00A1225. ROBERTS v. THE STATE.

(537 SE2d 86)

HINES, Justice.

Kenneth Gordon Roberts appeals his convictions for aggravated stalking, malice murder, and possession of a firearm during commission of a felony in connection with the fatal shotgun shooting of his estranged wife, Peggy Roberts. He challenges the sufficiency of the evidence, the denial of a continuance, the refusal to change venue, the admission of certain exhibits and testimony, and alleged improper conduct by the State. Finding the challenges to be without merit, we affirm.[1]

Roberts and his wife, Peggy, had been married approximately 16 years, when they separated in mid-September 1998. Roberts came to Peggy's workplace and argued with her. As Peggy ended the encounter, her co-worker and friend, Ammons, overheard Roberts tell Peggy, "I'll kill, you, bitch." On September 22, Peggy obtained a temporary protective order against Roberts; she averred to the court that Roberts had threatened her, abused her in the past, and that she was afraid of him and what he might do before she could get a divorce. The court restrained and enjoined Roberts from threatening or harassing his wife and prohibited him from contacting her, going to her residence or place of employment, and being within 200 yards of her. The day the protective order was entered, Irwin County Deputy Sheriff Young personally served Roberts by handing a copy to him; Young also explained the order to Roberts. Roberts became "upset, mad" and was cursing.

On September 24, Roberts went to the home of his friend, Warren, and told him that he was upset by the separation from Peggy and that he was thinking about killing himself and Peggy.

After the separation, Ammons followed Peggy home after work each night to ensure Peggy's safety. On the evening of September 28, 1998, Ammons had a family emergency and was unable to see Peggy home. Around 11:20 that evening, Griffin, who lived near the mobile home where Peggy was residing heard noises sounding like gunshots and called 911. As he was making the telephone call, Griffin heard a woman call for help and then scream, "Oh, God, no. Please, God, no."

---

[1] The crimes occurred on September 28, 1998. On January 4, 1999, a Ben Hill County grand jury indicted Kenneth Gordon Roberts for aggravated stalking, malice murder, and possession of a firearm during commission of a felony. Roberts was tried before a jury June 8-9, 1999, and found guilty on all counts. By sentence signed on August 19, 1999, and filed on August 30, 1999, he received life imprisonment for malice murder, and consecutive five-year prison terms for aggravated stalking and the firearm possession. A motion for new trial was filed on September 9, 1999, amended on February 21, 2000, and denied on March 2, 2000. The notice of appeal was filed on March 6, 2000, and the appeal was docketed in this Court on April 7, 2000. The case was submitted for decision on May 29, 2000.

More gunshots followed.

Deputy Sheriff Douglas arrived on the scene about 11:25 p.m. He knocked on the door of Peggy Roberts's mobile home, and Kenneth Roberts inquired who it was. Douglas replied that he was from the sheriff's office, and Roberts told Douglas to come in. Douglas opened the door about a foot, and saw Peggy lying on the floor with her head right by the door. Douglas drew his weapon and asked Roberts to come out. Douglas then heard a gunshot and Roberts say, "Oh, my God." Douglas could not see Roberts, but could hear Roberts's voice coming from straight in front of Douglas on the other side of the mobile home, near where a chair was later observed. At the time this shot was fired, Douglas could see Peggy still lying face down on the floor, speechless and motionless. Other officers arrived. The wind blew the mobile home door open more, and Douglas then saw an injured Roberts lying on the floor beside his wife's body.

Peggy Roberts died from a near-contact shotgun blast to the chest, causing massive hemorrhaging into the chest cavity. There was also evidence of bruising on her arms and hand, consistent with her struggling and trying to get away.

A blood-covered 12-gauge Mossberg pump shotgun was found in the trailer living room. A shotgun shell was discovered in the pocket of Roberts's jeans and an empty shotgun case was found in Roberts's car which was parked in front of the mobile home.

Blood spatter, tissue, and other evidence indicated that Peggy Roberts was shot while she was near the front door and fell to the floor as the result of the mortal injury. It also indicated that Roberts then suffered a self-inflicted gunshot wound while he was sitting in a chair in the living room. Because of the heavy saturation of blood and tissue, an outline of a body could be seen on the wall and chair.

At trial, Roberts testified that at lunchtime on the day of the murder, he inadvertently saw his wife and she invited him over that night to retrieve a gun of his that she had; she told him that the "warrant" against him had been dropped; Roberts arrived at the mobile home around 11:15 p.m. or 11:25 p.m.; when Roberts arrived, his wife was standing in the open doorway; she handed him a gun case and told him to come back after he put it in his car; the gun case felt light so Roberts opened it and found it empty; Roberts asked his wife where the gun was and she indicated it was inside the mobile home and asked him to come in; Roberts went inside and when he turned around he found his wife pointing the gun at him and he heard the safety go off; his wife fired a shot, they tussled over the gun, and Roberts got wounded; he regained consciousness lying in front of a chair, saw his wife on the floor, and fired the gun to summon help. He denied being shot while he was seated in the chair and further testified that he had no memory of anything else that hap-

pened that night; he did not know if he shot his wife, but that if he did so, it was possibly while he was "blacked out"; after he fired the gun for help, the next thing he recalled was coming to in the hospital two-and-a-half weeks later. Roberts could not explain the shotgun shell found in his pocket.

1. Roberts contends that the State failed to carry its burden of proof because he presented direct evidence of the circumstances of the shooting which proved self-defense and the State presented only circumstantial evidence to support its theory of what happened. But witness credibility is a matter for the jury, and to the extent that Roberts testified that he acted in self-defense, the jury was free to either accept or reject that testimony. *Knight v. State*, 271 Ga. 557, 559 (1) (521 SE2d 819) (1999). What is more, questions regarding the reasonableness of hypotheses are generally to be decided by the jury, and in a case in which the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis except that of the guilt of the accused, the jury's finding of guilt will not be disturbed unless the verdict is legally insupportable. *Clark v. State*, 271 Ga. 27, 28 (1) (518 SE2d 117) (1999). The evidence was sufficient to enable the jury to find Roberts guilty beyond a reasonable doubt of the crimes with which he was charged. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court did not abuse its discretion in denying Roberts a continuance. OCGA § 17-8-22; *Martin v. State*, 268 Ga. 682, 683 (2) (492 SE2d 225) (1997). Roberts moved for a continuance on June 7, 1999, the day before trial was scheduled to begin on the basis that defense counsel did not have adequate time to prepare, being unable to complete investigation of the case or interview witnesses. Yet the record indicates that by the time of the motion, defense counsel had represented Roberts for approximately six months, and counsel acknowledged the State's timely service of discovery material, that the State had been "very helpful," and that it had given "all kinds of information." In addition, the State had discussed its witnesses' anticipated testimony and the "meat" of the State's case so that defense counsel could focus on particular witnesses, any corresponding exhibit numbers and the Georgia Bureau of Investigation (GBI) case file. As the State observed at the hearing in the matter, Roberts's claim was self-defense, which did not involve other eyewitnesses. See *Roland v. State*, 266 Ga. 545, 546 (3) (468 SE2d 378) (1996). Also, at the hearing, the State agreed to attempt to make its witnesses, especially the GBI agent who did the blood spatter analysis, available to defense counsel ahead of trial and to give counsel "every accommodation." Moreover, Roberts has failed to demonstrate any harm from the denial of the continuance. *Lee v. State*, 258 Ga. 82, 84 (3) (365 SE2d 99) (1988).

3. On June 7, 1999, the day before trial, Roberts also filed a motion for a change of venue asserting that pretrial publicity would prevent a fair trial in Ben Hill County. In the motion, he asserted that two major Ben Hill and Irwin County newspapers published articles regarding the crimes and similar publicity was broadcast over radio and television in Ben Hill County, that the victim was a well-known citizen with high public visibility, and that the murder evoked great passion and prejudice in the community. Roberts complains that he was unable to present affidavit or oral testimony in support of his motion because the court erroneously failed to grant a continuance. But the complaint is unavailing.

Even though in his written change of venue motion Roberts requested, inter alia, a continuance[2] "to allow time for proper investigation of the prejudice in the local community," at the hearing on the defense motions, defense counsel did not ask for a continuance to contest venue. See Division 2, supra. Nor was there any explanation of why six months had not been sufficient time to investigate any prejudice due to pretrial publicity. In fact, counsel only commented that "at some point" it might "[become] apparent" that there should be a change of venue. Moreover, Roberts now fails to demonstrate either inherent or actual prejudice so as to warrant a change of venue. *Berry v. State*, 267 Ga. 605, 606 (2) (481 SE2d 203) (1997).

4. Roberts contends that the trial court erred in overruling his objection to Deputy Young testifying about the contents of State's Exhibit No. 1, the documents regarding the temporary protective order obtained by the victim, and his objection to Young or the assistant district attorney reading portions of the exhibit to the jury. He argues that Young was called as a witness to show that he had been served with a copy of the protective order, and that the State improperly went further to try to get Young to give legal opinions as to what the document said and to read parts of the document to the jury. Citing OCGA § 24-9-65,[3] he further urges that without a proper foundation such evidence would be inadmissible.

But State's Exhibit No. 1 was admitted into evidence without objection. Then on redirect, when Young was questioned about who sought the protective order, Roberts objected that the exhibit or document "speaks for itself." When the assistant district attorney sought to have excerpts read, Roberts's objection was that "there's no pur-

---

[2] The motion also requested $2,000 for costs of the investigation and procurement of evidence. The court had already authorized $750 for the defense investigation.

[3] OCGA § 24-9-65 provides:
Where the question under examination, and to be decided by the jury, shall be one of opinion, any witness may swear to his opinion or belief, giving his reasons therefor. If the issue shall be as to the existence of a fact, the opinions of witnesses shall be generally inadmissible.

pose in this" and later, that the reading was not in response to any question, that the State was trying to make closing arguments, and that the reading was "repetitive." Thus, Roberts did not object to evidence of the protective order on the bases now urged, and therefore, cannot make these objections for the first time on appeal. *Williams v. State*, 262 Ga. 422, 424 (6) (420 SE2d 301) (1992).

5. Roberts also fails in his contention that the trial court erred in admitting into evidence State's Exhibit No. 4, a photograph of a gun case found in Roberts's car parked outside the crime scene. He argues that because of the number of people who had searched the scene and moved items, the exhibit was not relevant to any material fact and should have been excluded.

To begin with, Roberts raised a different basis than relevance for objection below. See Division 4, supra. He objected because Deputy Douglas had observed the piece of evidence after other detectives had been there and "perhaps moved things and done things to it," and therefore, stated that a proper foundation was not laid. Second, generally a photograph offered to show a crime scene as it existed when police officers arrived is admissible. *Patterson v. State*, 256 Ga. 740, 741 (3) (353 SE2d 338) (1987). And Deputy Douglas testified that he did not see the gun case when he came to the scene, but saw it after detectives arrived on the scene and were inventorying items. He acknowledged that other officers could have moved the gun case from where it was when he first arrived. Thus, it was unlikely that the jury was misled by the purpose or content of the photograph. Id. at 741 (3). Finally, another photograph of the gun case in the car, State's Exhibit No. 7, was admitted without objection, and Roberts's own testimony indicated that he placed the gun case in his vehicle.

6. Roberts next asserts error in the admission of certain testimony by Deputy Douglas which he characterizes as "opinion testimony about what happened in an area that [Douglas] could not see." Specifically, he challenges Douglas's testimony about his perception of Roberts's location in the mobile home, that the victim did not fire the gunshot he heard, and Roberts's condition, i.e., that he was not wounded, when Douglas first arrived at the mobile home; he urges that there was no foundation laid to support the witness's opinion evidence, and, citing OCGA § 24-9-65, that where the evidence is as to the existence of a fact, the opinions of witnesses are generally inadmissible.

But Deputy Douglas was merely relating what he observed by use of his senses of sight and hearing. See *Horton v. State*, 258 Ga. 489, 490 (4) (371 SE2d 384) (1988); *Hicks v. State*, 256 Ga. 715, 722 (15) (b) (352 SE2d 762) (1987). And, "[a] witness may give testimony of [his] own opinion as to the existence of a fact, so long as the opinion is based upon the witness's own observations." *Kyler v. State*, 270

Ga. 81, 83 (3) (508 SE2d 152) (1998).

7. Roberts contends that the court erred in allowing GBI Agent Willis to give his opinion about how long the victim had been dead when Willis arrived at the scene, and to testify about observing bruises on the victim and that he thought the bruising on the victim's cheek was caused by her teeth when she fell to the floor. He again cites OCGA § 24-9-65 and argues that this was medical opinion testimony of facts given without proper foundation, and therefore, should have been excluded.

As noted in Division 6, supra, even a lay witness may give an opinion about the existence of a fact, if such opinion is from the witness's own observation. But here the State offered Willis as an expert in the area of lividity. The State established his substantial training and experience in the area of homicide investigation, in particular the decomposition, rigor mortis, and lividity of bodies. In fact, Willis testified that he had instructed the medical examiner in this case on bruise pattern analysis. Moreover, the court ruled that Willis could testify to such matters subject to his testimony being limited to his schooling and experience. Thus, the court did not abuse its discretion in allowing the testimony. *Matthews v. State*, 268 Ga. 798, 801 (3) (c) (493 SE2d 136) (1997).

8. Roberts fails in his final contention that the trial court erred by refusing to grant a mistrial because of alleged improper conduct by the State. The State attempted to use a copy of the victim's car title to cross-examine Roberts and Roberts's objection to the use of a copy was sustained. The State then tried to establish the reason for offering a copy, and the following colloquy occurred:

> "[Defense Counsel]: Your honor, we would ask that the jury be instructed to disregard this or else grant a motion for mistrial for improper conduct.
>
> The Court: Ladies and gentlemen, the only way a title can be introduced in court is by proper certified or exemplified copy of it, and a carbon copy is not an exemplified or certified copy of the title, and I instruct you that. Okay."

Roberts did not object to the curative instruction, ask for additional instructions, or renew his motion for mistrial. See *Pless v. State*, 260 Ga. 96, 98 (2) (390 SE2d 40) (1990). And any cross-examination of Roberts on the content of the copy was halted, and the original car title was subsequently admitted into evidence without objection. Under these circumstances, the court's curative instruction was sufficient to eliminate any prejudicial effect from the attempt to introduce inadmissible evidence. *Torres v. State*, 272 Ga. 389, 390 (2) (529 SE2d 883) (2000).

*Judgments affirmed. All the Justices concur.*

DECIDED OCTOBER 2, 2000.

*David E. Morgan III*, for appellant.
*Patrick J. McDonough, District Attorney, Richard E. Thomas, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Tammie J. Philbrick, Assistant Attorney General*, for appellee.